United States of America v. Sandra Haro Mr. Sully May it please the court, the counsel, and Ms. Rao Sandra Haro was a single mother and first-time funder when she got herself involved in a money laundering conspiracy. In like fashion, this is my first opportunity to present a oral argument before this honorable court. I must confess that I have been a little bit nervous that I might mess it up. Unlike Ms. Haro, though, I have no co-defendants or co-conspirators with whom to share the blame. However, in Ms. Haro's case, the overarching issue, perhaps, is that of co-conspirator liability. Where does it begin and where does it end, in particular regarding the issues of relevant conduct and the $1.8 million money judgment that was assessed against Ms. Haro? Since that money judgment was assessed, there has been an intervening decision, of course, by Supreme Court in Honeycutt as well as a recent decision by this honorable court in Sanjar. So unless the court has any questions or other issues it would like me to address at this time, I would like to start with that issue with the money judgment. In addressing the personal money judgment that was issued against Ms. Tittle, it was a $1.8 million money judgment. It is important to note that a money judgment, unlike other types of asset forfeiture, is a type of substitute property. It is not the actual tainted property, which in this case would be the laundered cash that in some cases wasn't seized, but rather it is a personal money judgment against Ms. Tittle that she would have to pay for legitimate sources such as future income, sale of legitimate property, and so forth. And a substitute property, as the Supreme Court explained in its decision in Honeycutt, the provisions of 21 U.S.C. 853P would apply. The government would only be able to obtain a money judgment, which is, again, a form of substitute property, if it can meet those conditions. And in discussing those conditions, the Supreme Court noted that substitute property is only available against a defendant who at one point possessed the tainted property and therefore is responsible for his dissipation. You didn't raise Honeycutt in your opening brief, though, did you? No, Your Honor, I was not raising the opening brief. I know the government raised it in the response, saying they don't think it applies here, but so how do we get around the fact that it wasn't raised below? I mean, that sort of makes sense. The Supreme Court hadn't come down with the decision, but then it wasn't even raised in the opening brief. Yes, Your Honor. The decision had not been rendered at a time that the briefing started. It was rendered before the brief was submitted. Fortunately, it was not included in the opening brief because we did not become aware of it until after it had already been submitted. But the government indicated that it was going to address that issue in its response. It did address the issue in its response and argue why it doesn't apply. And we have, of course, addressed the issue in a reply brief. We concede that the plain-error standard does apply because it wasn't raised before the district court either. But we believe that the issue is properly reported to the court since it has been raised both by the government in its briefing and by the appellant in this briefing. That was, of course, not the only argument that was raised against the money judgment. Ms. Soto raised several arguments before the district court as well as in her opening brief against the money judgment, including that it was excessive under the Eighth Amendment. In particular, the amount of the money judgment, the $1.8 million money judgment, far exceeded the amount that she personally gained from the offense. While the amount that she personally gained was never actually determined by the court, the best information that we have on the record was from her statement where she indicated that she was paid approximately 500 times each time she was involved. Even if we estimate on the high end, that's still well under $10,000 compared to the $1.8 million money judgment. That issue also comes up not only in addressing the excessiveness of the money judgment under the Eighth Amendment, but also in evaluating it under Honeycutt because, as Honeycutt explained, 853P limits substitute property to the property that the defendant at one point possessed. The only money that Ms. Soto possessed in this case was the funds that she was paid for her assistance in this case. The government has argued for a more expansive reading of this possession term, saying that it would include perhaps indirect control because of her role in this case. However, in looking at the actual Honeycutt decision, the appellant there was an individual by the name of Terry Honeycutt, who was in control of the sales and inventory of the store that sold pool supplies, and one of those chemicals was used in the manufacture of methamphetamine. The Supreme Court found that Mr. Honeycutt's control over the sales and inventory of that product and, of course, of the money that would have been received for its sale, did not mean that he had acquired the proceeds or property that would be required in that case for the money judgment that was rendered against the substitute property in that case. Other issues that came up with the money judgment, which were somewhat related to the relevant conduct, had to do with the district court's calculation of what it called the unseized amounts, the amounts of money that was laundered in the case by Misato or other pro-conspirators that was not seized by the government and therefore would be part of not only the money judgment but also the relevant conduct calculations. And in determining that, the appellant alleges that the district court made some reversible errors, not only of fact but also of law. I've touched on some of the legal issues regarding the calculation of the money judgment, but turning to the relevant conduct, the court addressed the issue of foreseeability when it was discussing relevant conduct. It indicated that it felt that amounts that it was assessing against Misato knowing that she may not have personally or directly been involved in laundering were nonetheless foreseeable to her. But the district court did not address the issue of whether those amounts were part of her jointly undertaken criminal activity, which is the- Well, didn't she admit they were? I mean, forget about foreseeability. I thought she confessed that she was involved in 10 to 15 of these transfers of the funds down to the valley or the border. Yes, Your Honor. She did admit that she was involved approximately 10 to 15 times. And she did admit to at least some of the- And how many did the court hold her accountable for? I forget the exact amount. I thought it was right about 14, 15. I believe it was around there, Your Honor. And that addresses the issue of the government's argument that even though the district court may not have found that the other amounts that Misato or other loans that Misato did not admit to or that there was no evidence linking her to, that the relevant conduct or the money judgment was nevertheless a reasonable estimate based on the amount of times that she admitted that she was involved. The part that's missing from that analysis is that even if she admitted that she was involved that many times, we don't have a reliable estimate, at least the court didn't make a reliable estimate, of what the average amount of those loans was for that number. The government has contended that the average should be about 100,000, which would put the relevant conduct close to, but not quite, the amount that the money judgment was. But the relevant conduct that the court calculated included amounts that were seized as well, which would greatly exceed even that average that the government is urging the court to adopt. But if we're relying on Misato's statement, which essentially was the only evidence of what other loans or amounts she was involved in, she indicated, for example, that the first amount that she had discussed with a co-conspirator was one of 30,000. There's one amount in the record that was discussed in the pre-sentence report. There's also testimony about a call regarding an amount that was either 70 or 75,000, depending on the 5,000 that may have been missing. They seized some 13,000 and some odd dollars from her in cash. Yes, Your Honor. Where was that seized? That was seized from her residence and from her person at the time that she was arrested after the indictment was issued. The total forfeiture ordered was a million eight, something of that range? I'm sorry, Your Honor? The total forfeiture ordered was a million eight. Yes, Your Honor. It was a little bit over 1.8 million. And that's geared toward the total enterprise that we're engaged in and the amounts of money that she was also participating in, correct? The government did allege that the approximately 13,000 that was seized from her and her residence was property that was involved in the money laundering conspiracy. That was something that Ms. Suttle contested ever since the forfeiture hearings in February. This was just casual, 13,000 she kept at home, purse money? I'm sorry? This was just purse money she had, 13,000 at home? The testimony of the agent I don't think was very specific as to where exactly it was located, other than I believe that some of it was on her person and the rest was somewhere in the residence. We don't know if it was a safe or a drawer. But the indication through the agent's testimony and through Ms. Suttle's statement was that that represented money that she had saved over a long period of time. It wasn't just money that she would carry around rather than have saved at her residence. That issue, of course, goes to – it's a smaller issue, at least in dollar amount, but the forfeiture of that currency, which wouldn't be substitute property, it's actual cash. But the issue with that was that the agent's testimony addressed whether 6,000 of that, which was given to her by one of the co-conspirators. She claimed it was repayment for a loan. The agent testified that – or tried to, I think, indicate that it was actually money involved in the conspiracy. Regardless of where that would fall, there wasn't any evidence or testimony presented as to the approximately other $7,000 that would remain of that to show why the entire amount would be forfeitable. And the evidence that was presented as to the approximately $6,000 consisted only of Ms. Suttle's statement that that was repayment of a loan that she had given to Mr. Bonilla, who was the father of the children, so she had been in a – essentially a common-law relationship before. But there was no evidence to show that that was the case. Well, Honeycutt was concerned with vicarious responsibility, attribution, conspiracies, et cetera. And Sotomayor's opinion focused heavily upon the particular forfeiture statute, which focused on the word obtained, meaning that the particular individual had personally obtained that money rather than someone with some affiliate, et cetera. This money is presented in her possession. So even if Honeycutt – if Honeycutt now – putting aside for the moment that we're on a different statute without that language obtained, assuming that those principles have still moved to that statute, how does that help you? How does Honeycutt help you on these facts? I don't believe that Honeycutt helps or hurts as far as the issue of the $13,000, because the issue of the $13,000 at the threshold is whether or not that money, that property, was property that was involved in the money laundering offense. If it was, then we're not arguing that she did not have possession over that money. In essence, we conceded that that money was received from her. Okay. So your focus is then on her responsibility for any part of the $1.8 million forfeiture? Yes, Your Honor. My focus is primarily on the rest of that amount, because it exceeds what the evidence showed that she was involved in the laundering as well as what she actually received. Well, the court – how court has turned its attention to two forfeitors, and one of the interesting things about that from our perspective is that so many of these are rich. We've given a moot court opportunity for a lot of lawyers ordering these millions of dollars of forfeitors and people that have just been handed sentences, long prison sentences. They're going to have a hard time paying that money out of the cigarette money. And we're not talking about seized money. The reality of this, just routinely imposing this, over 90% of these forfeitors ordered are never collected. I don't know if that helps or hurts your client. Well, in Ms. Sutter's case, as a record indication, she's a citizen. She's going to remain here once she's released, and this is something that's going to follow her for the rest of her life. She's going to have to repay the government out of any future earnings, any property that she acquires or has, such as her home. So it's definitely going to have an impact on her and perhaps some other things. Okay. Thank you. That is my time. Thank you. Thank you. May it please the court, Sangita Rao for the United States. Turning first to the Honeycutt issue, the $1.825 million forfeiture judgment in this case is not plainly erroneous for two major reasons. First, the money laundering forfeiture statute authorizes the forfeiture of funds that the defendant handled but did not retain, as supported by its text in legislative history. And second, the forfeiture judgment here is a reasonable estimate of the funds that defendant handled. Do you think that issue is properly before us? It's up to the district. I mean, you raised it, but it wasn't in the appellant's brief. I mean, you know the norm. I was somewhat surprised you all raised it. I guess you're just being extra cautious. That's exactly right, Your Honor. There is the rule that if a defendant hasn't raised an argument in its opening brief, it is waived it, but it would be in this court's discretion to hear this issue, and Honeycutt is such a major decision, and the government has agreed that Honeycutt applies to a number of other forfeiture statutes other than 853 and Sanjar, the government agreed. We wanted to make sure that this court understood that the money laundering statute is different because of its text in legislative history. Going first to the plain text of the statute and how it's different from Honeycutt, the drug forfeiture statute, 853A, which was the subject of Honeycutt, requires the forfeiture of proceeds the person obtained, as you mentioned, Judge King, about them. That focus on what a person obtained is what led the Honeycutt court to say personal possession was at stake. The 982A1 money laundering forfeiture statute is quite different. It instead forfeits any property involved in the offense. Involved is a broader term than obtains, as the Bermudas court, the Second Circuit. It's obviously different. I was a little puzzled by your concession that Honeycutt applies. You're going to apply it. I'm not sure I understand what you're conceding. Are you saying that we should apply the principle of Honeycutt, that is, that regardless of the particular formulation of the statute that is supporting the forfeiture, that we will insist upon proof that the property being forfeited or the money being forfeited were obtained by that individual and not attributed to them as part of a conspiracy? No, Your Honor. It depends on the text of the forfeiture statute at issue. So the government has agreed that Honeycutt applies to statutes other than 853A that have similar language as 853A. In particular, many other forfeiture statutes use the words, the defendant must proceed to the person obtained. Very similar. Many of them do not. Right. And I think that each one is going to require analysis. I'm just trying to understand the scope of your concession. There's not anything to concede if the other statutes use the same language the Court focused on. Well, we're not conceding in this case, Your Honor. I was simply responding to Judge Cross's question about whether it was properly raised in this case, and it is a matter of the Court's discretion whether it decides that the defendant, that this issue is in front of this Court, given that the defendant didn't raise it in the district court and didn't raise it in their opening brief. But we're not making any concession that Honeycutt applies to this statute. It does not apply. You're willing to argue Honeycutt here. It's all it amounts to. We're willing to argue the issue that this forfeiture statute is not – this forfeiture judgment is not plainly erroneous, even though Honeycutt is out there. And it's not because of the important textual differences. Unlike the 853A drug forfeiture statute in Honeycutt, this statute forfeits the money involved in the offense. Involved is a broader term than obtained, and the focus is on the offense. It's not on what the person obtained. So if you take that together, it's a very different, broader statute. But an even more compelling indicator is in Section 982B2, which is the intermediary exception. In that subsection, I'm sorry, the court, the Congress, indicated that there is a safe harbor for certain low-level money launderers. It provided that the substitute asset provision of 853P doesn't apply to someone who acted nearly as an intermediary, who handled but did not retain the laundered funds, unless that person engaged in three or more transactions totaling $100,000 in any 12-month period. So a bank exception. A SMRF exception, yes, Your Honor. So with that amendment to the money laundering forfeiture statute, Congress contemplated that 982A1 did attach to funds that a defendant handled but did not retain, and made very clear that when it's a high-level money launderer, a repeat offender, that the substitute asset provision applies. So when you take that text together with just the A1 broader language, the text of the money laundering forfeiture statute absolutely supports the money judgment here. Have any courts applied it to this statute? Applied Honeycutt to this statute? Not yet, Your Honor. There are a few unpublished district court opinions that actually involve the 2255, where forfeiture is not an issue, where courts have said, oh, involved is bigger, we don't think it applies, but it wasn't a holding, so we didn't cite it to this court. Basically, no court has held that Honeycutt does apply, so on plain error review, this court would have no basis. That's what it seems to me. I mean, it's your strategy, but you're almost making an issue where there isn't one, or might not be one. It's a strange strategy, but you can go ahead. It was an abundance of caution, Your Honor, given that this court could have raised the issue, and it takes some analysis to realize that Honeycutt doesn't apply to this statute. Going to the factual arguments that the defendant made about whether this defendant was actually accountable for $1.825 million, that amount is a reasonable estimate of what the defendant personally handled. The evidence shows that she was personally responsible, personally handled the $440,000 seizure from Ted Cantu's truck, the $175,000 that was discussed from October 2015, where there was a $5,000 shortfall in one of the loads that Harrell was partly responsible for making up, and then the $157,000 from March 2016 that was seized from the stash house that the defendant owned. If you add those three loads up, and even if you divide by four, because there was some evidence that the $175,000 load might have been two loads to start off with, you get an average load of $193,000. If you multiply that by 10, the minimum amount that she admitted to, because she admitted to her involvement in 10 to 15 loads, you get $1.93 million. So regardless of any of the other loads that the district court might have held her accountable for, just based on her loads alone, with estimates and extrapolations as this court has sanctioned before, she's responsible for that money. Unless the court has any other questions about specific issues, the government will rest on its brief. Thank you. Mr. Sulla, you have five minutes on the bubble. I'd like to start with the first issue that the government raised, which was that trying to differentiate the forfeiture under the money laundering statute to that of the drug proceeds statute. And there are important differences when one is looking at the actual property misforfeits. So if the actual drug proceeds had been seized or the actual laundering money had been seized, then certainly different provisions would apply. However, as I discussed earlier, when we're talking about substitute property, which is money judgment, the exact same statutory provision applies, which is 853P. And that is something that the Supreme Court in Hunnicutt discussed. It specifically discussed 853P and cited in the reply brief and showed that that was something that would not apply to money that a defendant had not actually possessed and not actually dissipated. And so that would be the same in this case because we are addressing a personal money judgment, which is substitute property under 853P. There are no differences between the two cases. The other issue that the government raised was that of the exception of 982B2, which was something that the appellant, Ms. Haddo, challenged also before the district court in its opening brief. The district court did find that that exception did not apply to Ms. Haddo if she had engaged in at least three transactions within a 12-month period. However, the district court made no specific findings as to which transactions it was referring to, what 12-month period, what amounts. And therefore, Ms. Haddo had argued that there was insufficient evidence or insufficient findings to support that that exception would apply. If that exception did not apply, then there would be no money judgment at all. As far as the factual issues, those have been addressed at length in briefs by both sides. But I'd just like to touch on a couple of those issues. One is that the government, as it did before this report, is trying to add the money that was seized at Ms. Bonilla's residence, her co-conspirator, a residence that was owned by Ms. Haddo. Toward the end of the case, to the previous amounts that were either successfully laundered or that were seized by the government. And Ms. Haddo argued to the district court that that constituted double counting, that since the money that was transported by truck drivers or otherwise delivered to Ms. Bonilla's residence would be the same money that was eventually seized at her residence. The district court disagreed and indicated that it did not believe that money would have stayed at Ms. Bonilla's residence for that long, that that did not seem reasonable for drug traffickers to want money to remain there that long. And normally… The whole point was to get the money across the border back to Mexico, right? Right. That was the goal of the state's job. And the district court indicated that and we don't disagree with that. But while the district court's statute of claims are entitled to high level of difference, there was no evidence in this case, no testimony by an agent, for example, to say, well, in the typical money laundering conspiracy, in this case in particular, we observed that money would stay at a particular statute of location for only a few days or it might remain there for several months. So for the district court to make the conclusion, either in general or in this particular case, that it was simply not possible, despite the absence of any seizure from that residence, any surveillance or other evidence that would show that the money had left the residence before then, to conclude that that money could not be the same money that was previously disclosed. Counsel, let me ask you one question about 982A1. It's the inclusion of any property involved in such offense. Doesn't that make it broader than 982A7, the provision that was issued in Sanjar? It does, Your Honor. Does that mean that any money laundering, the whole principle that we've been talking about in Honeycutt was not going to reach this money laundering because all the money in money laundering is all the money? Yes, Your Honor, and that would be a significant difference if we were discussing the money that was actually laundered that had been seized. Then we wouldn't be able to make the argument under Honeycutt that the entire money that was involved in the money laundering conspiracy shouldn't therefore be forfeited. It is the tainted property that was the money involved in the conspiracy. But when we're discussing substitute property, we would argue that it is a difference in the rate of 50-50. All right. Thank you, Your Honor.